### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DOUGLAS STALLEY,**

        **Plaintiff,**

**v.**                           **Case No:  6:14-cv-1074-Orl-28DAB**

**ALLSTATE INSURANCE COMPANY
and ALLSTATE INDEMNITY
COMPANY,**

        **Defendants.**

_____

## ORDER

In this third-party bad faith insurance action, Plaintiff Douglas Stalley, as the guardian of the property of Benjamin Hintz ("Hintz"), asserts that Defendants Allstate Insurance Company and Allstate Indemnity Company (collectively "Allstate") acted in bad faith by failing to settle Hintz's liability claim against Allstate's insureds following an automobile accident.  The case is before the Court on the Motion for Summary Judgment (Doc. 78) filed by Allstate.  Having considered the motion, Plaintiff's Response (Doc. 94), Allstate's Reply (Doc. 98), and the record, the Court denies Allstate's motion.

## I.    Background

At approximately 11:30 p.m. on June 2, 2009, thirty-year-old Hintz suffered a head injury when his scooter was struck from behind by a Volkswagen Beetle driven by eighteen-year-old Emily Boozer ("Emily") and owned by Emily's father, Otto Boozer ("Otto").  Hintz, who was not wearing a helmet, went over the windshield of the Beetle and landed on the shoulder of the road.  He initially refused medical treatment but was taken to the emergency room at Holmes Regional Medical Center, where doctors determined that he had a two-

centimeter epidural hematoma and encephalopathy.  (See Accident Report, Doc. 78-8, at 3; Hospital Records 06/03/2009, Doc. 78-9).  He ultimately suffered severe brain damage,[1] was determined by a state probate court to be totally incapacitated,[2] and required nursing care upon discharge from the hospital several months after the accident.

The Beetle was insured under Emily's parents' Allstate automobile insurance policy,[3] which had bodily injury limits of $100,000 per person/$300,000 per accident and property damage limits of $100,000 per accident.[4]  On June 3, Emily's mother, Stacy Boozer ("Stacy"), reported the accident to Allstate.  In a letter dated June 9, the law firm of Abrahamson, Uiterwyk & Barnes ("the Uiterwyk firm") informed Allstate that it represented Hintz and requested disclosure of insurance coverage information within thirty days

---

[1] Although Hintz was noted as being neurologically stable after being admitted to the hospital, (Doc. 78-9 at 1), his neurological condition changed on June 10, (see Doc. 78-19); he underwent an emergency craniotomy on June 10 or 11, (see Docs. 78-19, 78-20, & 78-39); and around that time he suffered a stroke, (see Doc. 78-16 (June 12 hospital progress note reflecting "continued evolution of contusion and stroke")).  In a separate, still-pending lawsuit in state court, Plaintiff has sued the treating doctors and the hospital, alleging that they severely exacerbated Hintz's injuries through their negligence.  (See Medical Malpractice Complaint, Doc. 78-68; July 24, 2015 Fifth District Court of Appeal Opinion, Doc. 37-1).

[2] The Order Determining Total Incapacity, dated August 27, 2009, states that "Hintz suffered disabling and catastrophic injuries as a result of a motor vehicle accident which occurred on June 2nd, 2009 . . . including severe brain injuries." (Doc. 78-42).  Letters of Plenary Guardianship of the Property of Hintz were issued to Plaintiff that same day.  (Doc. 1-1 at 4).

[3] Policy Number 971123307.

[4] Emily was not a named insured or a listed driver on this policy, but the Beetle was a listed vehicle.  Coverage for the accident under this policy was never contested by Allstate and is not at issue here.  However, six weeks after the accident, Allstate sent Emily's parents a Notice of Non-Renewal of the policy based on "an operator using the insured vehicle(s) who is not a resident of the household and/or is not rated on the policy." (Notice of Non-Renewal, Doc. 94-2).  Emily had previously been a listed driver on the policy but was removed at Otto's request in October 2008.  (See Doc. 94-4).

pursuant to section 627.4137, Florida Statutes.[5] (Doc. 78-10). The letter also revoked any medical authorization that might have been provided to Allstate by Hintz. (Id.).

By June 10, the liability claim under Stacy and Otto's automobile policy had been assigned to Allstate claims adjuster Tammy Miller. On that date, Miller noted in Allstate's electronic claim diary that the issue of liability in the accident was "unclear at this time"; that she had requested a copy of the police report; that Hintz had been admitted to Holmes Regional with a skull fracture and a brain bleed; and that an employee of the Uiterwyk firm had informed her that Hintz had "just been released from ICU but is still in the hospital in and out of consciousness." (Doc. 78-2 at 6 & 11).

On June 11, Miller sent two letters to Otto, Stacy, and Emily. (Docs. 78-13 & 78-14). One of these letters advised of the bodily injury limits under Otto and Stacy's policy; stated that the value of Hintz's bodily injury claim appeared to exceed the policy limits and that if they had any additional coverage that might apply they were to contact Allstate immediately; advised that the policy allowed for an attorney to be retained to defend them if a lawsuit was filed and that they also had the right to hire an attorney of their own choosing; and stated that a jury could find them liable for all or part of Hintz's medical bills, lost wages, and other damages. (Doc. 78-13 at 1). The letter also stated: "We will make every effort to settle this case within your insurance coverage in exchange for a full and final release of all claims. However, if the case cannot be resolved within your policy limits,

---

[5] This section, titled "Disclosure of certain information required," provides that within thirty days of a written request an insurer must provide a sworn statement setting forth information including: the name of the insurer; the name of each insured; the limits of the liability coverage; policy or coverage defenses that the insurer reasonably believes to be available; and a copy of the policy. § 627.4137(1), Fla. Stat. The statement must be immediately amended if facts are discovered that call for an amendment. Id. § 627.4137(2).

you may consider contribution of your own funds to resolve the matter and avoid an excess judgment. I will keep you informed of any demands and offers to resolve this matter." (Doc. 78-13). The second June 11 letter asked Otto, Stacy, and Emily if, among other things, they had "any other liability policies with Allstate, or any other insurance carrier, including umbrella policies, which could provide coverage for this accident." (Doc. 78-14).

Miller received a copy of the police report on June 11. (See Doc. 78-2 at 9). That report (Doc. 78-8) indicated:  that Hintz was driving carelessly and that Emily did not engage in any improper driving, (Doc. 78-8 at 2); that "it is not known if the scooter had its lights on," (id. at 3); that Hintz "denied having been operating any sort of vehicle," insisted that he had been walking rather than driving, and "said he had a few beers after work," (id.); and that Emily "said that she did not see [the scooter] and that he came out of nowhere," (id. at 6). However, statements that were included in that accident report from two witnesses traveling together behind Emily in an adjacent lane indicated that both witnesses saw Hintz traveling ahead of the Beetle before the collision, and one of these witnesses stated that Hintz was "quite visible and moving in a straight line on the right side of [Emily's] lane." (Id. at 7–8).[6]

On June 12, Miller assessed liability at "60-70% against" Emily. (Doc. 78-2 at 11). Having learned from the hospital that Hintz's bill was over $80,000 at that point, Allstate decided to tender the $100,000 bodily injury policy limits, (Doc. 78-2 at 11–13), and on

---

[6] Despite the initial accident report indicating that Emily did not engage in improper driving, Emily was later cited for failure "to use due care by her failure to reduce speed when approaching a slower moving [vehicle] approaching the crest of a hill." (Traffic Court Documents, Doc. 78-6, at 1). A later Incident Report of the Melbourne Police Department states that the two witnesses initially described Hintz as a "bicyclist" who "was swerving in the far right lane" but that "upon obtaining a written statement, they both say that he was not swerving and was possibly driving a scooter rather than a bicycle." (Id. at 4).

June 12, Miller sent a letter to the Uiterwyk firm enclosing a check for $100,000 with a proposed general release, (Doc. 78-15).  And, on June 24, responding in part to the June 9 letter, Miller sent the Uiterwyk firm a Limits of Insurance Affidavit reflecting the $100,000/$300,000 bodily injury and $100,000 property damage limits of Stacy and Otto's automobile policy and stating that no other insurance coverage was known at that time. (Doc. 78-23).

On June 26, attorney Hendrik Uiterwyk of the Uiterwyk firm sent a letter in response to Miller's June 12 letter:

> I have received [your letter of] June 12, 2009, containing an offer for [bodily injury] only, with a proposed release . . . .
>
> . . . That release form looks fine for a unilateral release of [bodily injury] only but is not what our client would prefer to do. **What he would be more interested in, we are sure, is a global settlement of all [property damage] and [bodily injury] claims.**  If we get everything we need to make that happen soon, we will have a settlement.
>
> . . . .
>
> Accordingly, **please let us have your very best offer for a global acceptable mutual release of all [bodily injury] and [property damage] features for the claim.**  We would also like your policy and disclosures as detailed on our attached form.
>
> We are sure we can get this resolved if we all work promptly and expeditiously on this.

(Doc. 78-26 (emphasis added)).  Referring to Uiterwyk's June 26 letter as a "demand letter," Miller forwarded it to Emily, Stacy, and Otto on June 30 and advised that Miller would "make every effort to settle the claim for an amount within [the] policy limits" but that "the claim may not resolve quickly."  (Doc. 78-27).  Miller's June 30 letter further advised that if a lawsuit was filed against them, they should contact Allstate immediately and Allstate would provide them with a defense attorney at no cost; that they may be personally

responsible for any jury awards that exceed the policy limits, though Allstate had "no information at th[at] time which would support a claim for amounts in excess of [the] policy limits"; and that they may want to retain their own personal attorney. (Id.).

In early July, the claim was reassigned from Miller to Allstate adjuster Heather Anderson.[7]  On July 8, Allstate retained attorney John Krentzman to represent it, and around that time it also hired attorney Bill Wright to represent Otto and Emily.  (See Doc. 78-5 at 8; Doc. 78-2 at 25–26, 28).  Anderson testified in her deposition that she hired Krentzman "to assist the clarification of [Uiterwyk's June 26] letter and find out . . . what exactly the demand was" and "assist with getting the claim resolved." (Doc. 79 at 52).  On July 9, Krentzman wrote to Uiterwyk advising that he represented Allstate and requesting clarification of the June 26 letter, in which Uiterwyk had expressed interest in "a global settlement of all [property damage] and [bodily injury] claims." (Doc. 78-29).[8]  Krentzman wrote to Uiterwyk regarding the property damage claim again on July 16, noting their telephone conversation of that date.  (Doc. 78-31).

Meanwhile, as reflected in notes in Allstate's electronic claim diary, on July 9 Anderson spoke with both Emily and Otto.  On that date, Emily told Anderson that she was living with her parents at the time of the accident, whereas Otto stated that at the time of the accident Emily had been living with her grandparents for three or four months but

---

[7] Miller and Anderson explained in their depositions that the file was reassigned because Miller was going on a two-week vacation. (Miller Dep., Doc. 86, at 138; Anderson Dep., Doc. 79, at 29–30).

[8] In the July 9 letter, Krentzman listed figures for the cost of a new scooter, towing, and storage and asked Uiterwyk to "advise if the figures reflected are accurate" and "[i]f not, please let us know what the correct amounts are." (Doc. 78-29).  Krentzman also inquired as to any loss of use and "any other property damage for which your client is entitled to reimbursement." (Id.).

moved back to her parents' home after the accident. (Doc. 78-2 at 26). On July 22, Anderson spoke with Stacy and Otto's Allstate agent, Chris Johnson, and asked if he insured Emily's grandparents, Fred and Ruth Boozer, as well. (Id. at 28). Johnson advised that he did handle Fred and Ruth's insurance, and he located an automobile policy[9] for Fred and Ruth with bodily injury limits of $100,000 per person/$300,000 per accident. (Id.). Anderson asked Johnson if Fred and Ruth had an umbrella policy, and indeed they did, with $1 million of coverage.[10] (Id.).

Under the terms of Fred and Ruth's Allstate policies, the $100,000 automobile policy would cover the accident if the Beetle was "[a] non-owned auto used by . . . a resident relative with the owner's permission" and was "not . . . available or furnished for the regular use of" Emily, and the $1 million umbrella policy would cover Emily—a grandchild and therefore a relative—if she was "a resident of [their] household." (See Doc. 78-61).[11] On July 22, Anderson indicated in the claim diary that files needed to be set up under both policies and that an investigation for excess coverage needed to be conducted. (Doc. 78-2 at 28). Anderson spoke to Fred, Emily, and Otto on July 24, and all three told her that Emily resided with Fred and Ruth on the day of the accident. (Id. at 29).

---

[9] Policy Number 091644734.

[10] Policy Number 091534151.

[11] On the Accident Report, Emily's address is listed as her grandparents' address. (Doc. 78-8 at 1). Otto's address—different from the grandparents' address—is listed just above that on the Accident Report, where information for the vehicle's owner is specified. (See id.). Emily's place of residence apparently did not make a difference with regard to coverage under Otto and Stacy's automobile policy because the Beetle was a listed, insured vehicle. There are some references in Allstate's electronic claim diary to Emily as a "resident relative" shortly after the claim was reported, but it is disputed whether Allstate asked where Emily resided when the claim was reported or just assumed that she resided with her parents. Part of Plaintiff's assertion of lack of diligence by Allstate pertains to Allstate's failure to ascertain at the time the claim was reported where Emily resided and with whom she lived, which had implications in terms of possible umbrella coverage.

On July 24, Allstate completed an Amended Affidavit of Insurance and faxed it to Krentzman. (See Doc. 78-2 at 29). Krentzman sent the Amended Affidavit to Uiterwyk that same day with a letter stating that "Allstate's investigation has revealed that at the time of the accident, Allstate's insured driver was living with her grandfather," (Doc. 78-35 at 1). The Amended Affidavit listed Otto and Stacy's automobile policy with $100,000/$300,000 bodily injury limits, Fred and Ruth's automobile policy with those same limits, and Fred and Ruth's $1 million umbrella policy. (Doc. 78-35 at 3).

On August 7, Krentzman again wrote to Uiterwyk, stating: "I have not heard from you regarding your client's property damage. I would appreciate hearing the same so that we can move towards resolution on those issues." (Doc. 78-38). On August 17, 2009, an Allstate manager referred the claim to Allstate's home office based on the "nature and severity of [the] claim and the add[itional] insurance coverages available." (Doc. 78-2 at 30 & 33). By August 21, 2009, Allstate's claim diary reflected that Hintz's hospital bill was more than $485,000. (Id. at 33). On September 2, 2009, an Allstate manager noted in the claim diary that the reserve on Fred and Ruth's automobile policy needed to be set to the policy limits and that the reserve on the umbrella policy should be set at $500,000. (Id. at 33-34).

On September 4, 2009, Uiterwyk sent a letter to Krentzman confirming the property damage amounts that Krentzman had sent him on July 9: $1,099.00 for a new scooter, $165.95 for the tow bill, and 18 days of storage at $22.80 per day, (Doc. 78-44)—a total of $1,675.35. Uiterwyk instructed Krentzman to "send us whatever title documents you require my client to sign with a draft for the property damage. I will have a disbursement meeting set up with my client a couple of weeks from now." (Id.). On September 8,

Krentzman forwarded Uiterwyk's September 4 letter to both Anderson and Bill Wright, the attorney Allstate had hired to represent Emily and Otto. (Doc. 78-45). On September 29, Krentzman sent Uiterwyk a draft from Allstate for $1,675.35 for property damage. (Doc. 78-49).

On October 9, Uiterwyk responded to Krentzman's September 29 letter, thanking him for the property damage check and stating that he had "deposited it to [his] trust account and w[ould] process it on to [his] client." (Doc. 78-52). Uiterwyk further stated: "I guess I will have no choice but to move on with the lawsuit for bodily injury damages," and he returned the $100,000 bodily injury check that Allstate had sent to him back on June 12. (Id.). Though not mentioned in that October 9 letter, Uiterwyk had already filed a negligence lawsuit on September 22 in state circuit court against Emily, Otto, and Stacy on behalf of Plaintiff, who had been appointed guardian of the property of Hintz in August. (State Court Compl., Doc. 78-47). Emily, Otto, and Stacy were served with the suit papers in late October or early November. (See Doc. 78-2 at 37–38).

On October 22, Anderson wrote to the Uiterwyk firm requesting medical records and bills so that Allstate could "properly evaluate [Hintz's] bodily injury claim." (Doc. 78-53). On October 28, Allstate hired attorney David Shelton to examine the question of coverage under Emily's grandparents' policies. (See Doc. 78-7; see also Shelton Dep., Doc. 87, at 7-8). On December 21, Shelton provided Allstate with his opinion regarding coverage under those two policies. (Shelton email, Doc. 78-57). Shelton concluded based on a recorded statement taken from Emily in November that Emily was residing with her grandparents on the date of the accident and that therefore she was an "insured person" under the grandparents' $1 million umbrella policy. (Id.). On the other hand, Shelton

concluded that the Beetle did not qualify as an "insured auto" under the grandparents' $100,000 automobile policy because the Beetle was available for Emily's "regular use" and therefore was excluded; thus, the grandparents' automobile policy did not cover the accident. (Id.). That same day, Allstate adjuster Jeffrey Bone—to whom the issue of coverage under Fred and Ruth's two Allstate policies had been assigned—sent letters to Uiterwyk, Otto, Stacy, and Emily explaining these coverage decisions. (Doc. 78-61).

On December 18, Allstate learned from the hospital that Hintz had been discharged on October 5 with a total bill of $547,403.35. (Doc. 78-2 at 41). On December 22, Anderson noted in the claim diary that Krentzman had spoken with Uiterwyk; Uiterwyk told Krentzman that Hintz was brain damaged and that Uiterwyk thought the bills were around $800,000. (Id. at 42). On December 28, Uiterwyk wrote to Krentzman, confirming that Hintz's "brain injury continues to disable him and his largest source of medical bills is still from Holmes Regional Medical Center" and telling Krentzman to let him know in writing if there was anything else he or Allstate needed from Uiterwyk. (Doc. 78-58).

Krentzman responded in a December 30 letter:

> Thank you for your correspondence of December 28, 2009. Confirming, and in follow-up to the same, my call of last week was to learn the medical condition and medical bills of your client, none of which have been furnished to either myself, or Attorney Bill Wright, on behalf of the insureds, at this point in time. Although you advised me that he has a "brain injury," you deferred providing any additional information so that no misstatement was made. However, you did indicate to me that Allstate already has this information since it has been provided to the Allstate PIP unit.
>
> To my knowledge, no permission has ever been given for Allstate's liability unit to view the personal injury protection file. I imply [sic] from your comments that Allstate's liability unit has that permission. If I am in error in this regard, please notify me before 5:00 pm on January 4, 2010. If I do not hear from you at that time I will assume from your silence that permission is granted.

(Doc. 78-59). Uiterwyk responded by fax that same day, stating: "As I have told you before, whatever you need from me is available just by sending a written request. If you thought you needed my permission to look in the PIP file, all you had to do was ask, and of course you can look at it now." (Doc. 78-60).

On January 12, 2010, Krentzman sent a letter to Uiterwyk noting that Allstate had looked at the records in the PIP unit, enclosing two checks—one for $100,000 and one for $1 million—and asking Uiterwyk to notify Krentzman if he found this tender of the policy limits to be acceptable. (Doc. 78-63). Uiterwyk responded on January 15 by asking for an explanation of "why Allstate has handled the claim like this" and stating that he would "hold on to these two checks and not deposit them for a week, waiting on [Krentzman] to send [him] Allstate's explanation." (Doc. 78-64). Krentzman responded ten days later, stating: "After review of the medicals contained in the PIP file, and after further review of coverage, liability, and damages, Allstate decided to tender to you the full available liability limits. Please advise me if you are interested in proceeding with this settlement so that we can work out the appropriate closing paperwork." (Doc. 78-65). On February 4, Uiterwyk returned the checks with a letter stating that "having received [Krentzman's] explanation, it is clear that Allstate has no respectable excuse for the way it has handled this claim" and advising that rather than accepting the tender he and his client would "proceed to trial and seek a judgment against [Allstate's] insured for the full measure of [Hintz's] damages." (Doc. 78-66 at 3).

Indeed, Plaintiff's state court action proceeded to trial and resulted in a jury verdict in favor of Plaintiff and against Emily and Otto in the amount of $14,905,585.29. (See Final Judgment, Doc. 1-1 at 18). The jury apportioned 25% of comparative fault to Hintz, for a

net verdict of $11,179,188.97.  (See id.).  The liability of Otto, as the owner of the car, was capped by Florida statute at $100,000.00, (see id.),[12] and on August 20, 2012, judgment was entered against Emily in the amount of $11,179,188.97 and against Otto in the amount of $100,000.00, (Doc. 1-1 at 19).  Allstate then paid $1.1 million—consisting of the $100,000 limits under Stacy and Otto's automobile policy and the $1 million limits under Fred and Ruth's umbrella policy—in exchange for a satisfaction of judgment as to Otto and a partial satisfaction of judgment as to Emily.  (See Doc. 2 at 4; Doc. 1-1 at 21–23).

Plaintiff filed this bad faith action against Allstate in state court in 2014, and Allstate removed it to this Court.  (Compl., Doc. 2; Notice of Removal, Doc. 1).  Plaintiff seeks to recover from Allstate the unsatisfied portion of the final judgment—$10,079,188.97—plus interest.  (Doc. 2 at 5 & 8; see also Joint Pretrial Statement, Doc. 121, at 4).  Allstate now moves for summary judgment in its favor.

## II.   Legal Standards—Summary Judgment and Bad Faith

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When faced with a "properly supported motion for summary

---

[12] See § 324.021, Fla. Stat., cited in Final Judgment (Doc. 1-1 at 18).

judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

This case involves a single claim of third-party bad faith against Allstate. "'[T]he essence of a third-party bad faith cause of action is to remedy a situation in which an insured is exposed to an excess judgment because of the insurer's failure to properly or promptly defend the claim.'" Macola v. Gov't Emps. Ins. Co., 953 So. 2d 451, 458 (Fla. 2006) (quoting Cunningham v. Standard Guar. Ins. Co., 630 So. 2d 179, 181 (Fla. 1994)). Where an insurer is "found to have acted in bad faith, the insurer [has] to pay the entire judgment entered against the insured in favor of the injured third party, including any amount in excess of the insured's policy limits." State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So. 2d 55, 58 (Fla. 1995).

"Under Florida law, 'the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the totality of the circumstances standard.'" Mesa v. Clarendon Nat'l Ins. Co., 799 F.3d 1353, 1359 (11th Cir. 2015) (quoting Berges v. Infinity Ins. Co., 896 So. 2d 665, 680 (Fla. 2004)). "The question of whether this standard has been met is ordinarily for the jury to decide." Id. However, the Eleventh Circuit has found that summary judgment is appropriately granted where the plaintiff "fails to provide sufficient evidence for a reasonable jury to find that [the insurer] acted in bad faith." Id.; accord Messinese v. USAA Cas. Ins. Co., 622 F. App'x 835, 840 (11th Cir. 2015); Coulter v. State Farm Mut. Auto. Ins. Co., 614 F. App'x 998, 1001 (11th Cir. 2015); Novoa v. Geico Indem. Co., 542 F. App'x 794, 796 (11th Cir. 2013); Aboy v. State Farm Mut. Auto. Ins. Co., 394 F. App'x 655, 656 (11th Cir. 2010); Valle v. State Farm Mut. Auto.

Ins. Co., 394 F. App'x 555, 557 (11th Cir. 2010); Maldonado v. First Liberty Ins. Co., 342

F. App'x 485 (11th Cir. 2009).

In Boston Old Colony Insurance Co. v. Gutierrez, 386 So. 2d 783 (Fla. 1980), the

Supreme Court of Florida set forth many of the principles governing Florida third-party bad

faith claims:

> An insurer, in handling the defense of claims against its insured, has a duty
> to use the same degree of care and diligence as a person of ordinary care
> and prudence should exercise in the management of his own business. For
> when the insured has surrendered to the insurer all control over the handling
> of the claim, including all decisions with regard to litigation and settlement,
> then the insurer must assume a duty to exercise such control and make such
> decisions in good faith and with due regard for the interests of the insured.
> This good faith duty obligates the insurer to advise the insured of settlement
> opportunities, to advise as to the probable outcome of the litigation, to warn
> of the possibility of an excess judgment, and to advise the insured of any
> steps he might take to avoid same. The insurer must investigate the facts,
> give fair consideration to a settlement offer that is not unreasonable under
> the facts, and settle, if possible, where a reasonably prudent person, faced
> with the prospect of paying the total recovery, would do so.

Id. at 785 (citations omitted). "An insurer—acting with diligence and due regard for its

insured—is allowed a reasonable time to investigate a claim; no obligation exists to accept

a settlement offer (or to tender policy limits in advance of a settlement offer) without time

for investigation." Johnson v. Geico Gen. Ins. Co., 318 F. App'x 847, 851 (11th Cir. 2009)

(citing Gutierrez, 386 So. 2d at 785, and DeLaune v. Liberty Mut. Ins. Co., 314 So. 2d 601

(Fla. 4th DCA 1975)). "While negligence is relevant to the determination of bad faith,

Florida law is clear that the standard 'for determining liability in an excess judgment case

is bad faith rather than negligence.'" Coulter, 614 F. App'x at 1000 (quoting Campbell v.

Gov't Emps. Ins. Co., 306 So. 2d 525, 530 (Fla. 1974)).

"Bad faith may be inferred from a delay in settlement negotiations which is willful

and without reasonable cause." Powell v. Prudential Prop. & Cas. Ins. Co., 584 So. 2d 12,

14 (Fla. 3d DCA 1991). "The lack of a formal offer to settle [from the claimant] does not preclude a finding of bad faith. Although an offer of settlement was once considered a necessary element of a duty to settle, . . . an offer to settle is not a prerequisite to the imposition of liability for an insurer's bad faith refusal to settle, but is merely one factor to be considered." Id. (citations omitted). "Where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." Id. Moreover, "the ultimate tender of the policy limits does not automatically insulate an insurer from liability for bad faith." Id. at 15.

## III. Discussion

In its motion for summary judgment, Allstate asserts that no reasonable jury could conclude that its conduct was anything more than negligent. On this record, however, the Court cannot appropriately determine the question of bad faith at the summary judgment stage, and this case must be resolved by a jury.

Allstate notes that it tendered the known policy limits within ten days of the accident and that it "over the course of six more months investigated, located, and confirmed an additional one million dollars in insurance coverage, confirmed [that] Hintz' injuries warranted payment of those funds, and paid them while keeping the insureds informed." (Doc. 78 at 19). Allstate further asserts that it:

> did not deny Hintz' claims, did not question the information about Hintz' injuries disclosed by Hintz' lawyers (albeit belatedly), did not reject any offer to settle, did not make a low compromise offer, did not deny coverage or force its insured to defend an action for declaratory judgment to clarify coverage, did not fail to communicate meaningfully and fully with its insured parties, did not fail to diligently investigate coverage, liability or damages, and did not do anything else to indicate its interest was saving money and not paying out the funds once it was determined that they were rightfully owed. It acted fairly and honestly toward [Emily] and with due regard for her interests, hiring a lawyer to represent her even before suit was filed, as well as two lawyers to assist getting the claims resolved and to determine coverage for her benefit.

15

> Allstate continued to put [Emily's] interests ahead of its own, and its adjusters continued to handle their investigations of each component of the claims diligently, just as a reasonable business person would under the totality of circumstances, particularly when the question was whether $1.2M in insurance should be paid.

(Id. at 20–21).

While Allstate did act with some diligence at the outset of the claim—tendering the bodily injury policy limits within ten days of the accident—Allstate's arguments miss the mark to the extent that Allstate asserts that it clearly was diligent throughout the seven-month period from the June 2, 2009 accident to the January 12, 2010 tender of $1.1 million. Jury questions remain regarding whether Allstate should have resolved issues regarding damages and coverage under Emily's grandparents' policies prior to December 2009 and should have offered to settle Hintz's claim within the $1.1 million policy limits prior to January 2010.

Allstate attempts to justify its actions by pointing to Uiterwyk's cryptic June 26 letter seeking "a global settlement of property damage and bodily injury claims" and the issue that arose by July 2009 regarding Emily's residence that triggered the potential of an additional $1.1 million in coverage.  Although the June 26 letter likely would have perplexed most anyone confronted with it and although Krentzman did attempt to work with Uiterwyk to resolve Uiterwyk's asserted interest in reaching a "global settlement" that included property damage (even though Hintz's property damage was obviously negligible), the settlement landscape changed once the umbrella policy emerged in July.  Allstate asserts that Uiterwyk "did not react to this new information in any way"; he did not make a demand or provide medical records to support Hintz's bodily injury claim.  (Doc. 78 at 22).  However, Allstate did not "react to this new information in any way" either with regard to negotiating with Uiterwyk, even though Allstate's claim diary reflects its awareness that Hintz's hospital

bill had topped $338,000 by July 6, (see Doc. 78-2 at 25), and $485,000 by August 21, (see id. at 33).

The Eleventh Circuit recently reiterated that "the law of bad faith in Florida requires that a court 'focus . . . not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured.'" Moore v. GEICO Gen. Ins. Co., No. 14-13356, 2016 WL 736824, at *6 (11th Cir. Feb. 19, 2016)[13] (alteration in original) (quoting Berges, 896 So. 2d at 677). In Moore, the Eleventh Circuit reversed the district court's grant of summary judgment to the insurer, noting that the district court "faulted [the claimant's attorney]—rather than [the insurer]—for allegedly impeding the settlement negotiations." Id. Like the Moore district court, Allstate focuses on Uiterwyk's actions rather than its own, and this Court cannot, on summary judgment, appropriately place all blame on Uiterwyk for the settlement negotiations that did or did not occur after discovery of the umbrella policy.

Allstate also notes that when faced with the question of Emily's residency and its implications for coverage under Fred and Ruth's policies, it retained lawyer David Shelton "to assist with a legal opinion" and "[i]t took him five weeks to complete his legal analysis." (Doc. 78 at 22). Allstate does not, however, explain why it did not retain Shelton until October 28—three months after the residency issue arose. Moreover, it is not clear why Shelton's opinion was not rendered—and Allstate's coverage position finalized—until five weeks after he was provided with Emily's recorded statement. On this record, the Court

---

[13] The February 19 Moore opinion cited in the text is the opinion on panel rehearing. On January 12, 2016, Plaintiff submitted the Eleventh Circuit's initial Moore opinion—issued that day—as supplemental authority. (See Doc. 97). The February 19 opinion reaches the same conclusion as, and varies only slightly from, the January 12 opinion.

cannot remove from the jury the question of whether Allstate acted diligently with regard to determining coverage under Fred and Ruth's policies.

Allstate also contends that it did not have enough information about damages to make a policy limits offer until it obtained permission from Uiterwyk on December 30 to look in the PIP file. Although there is evidence that Uiterwyk was not forthcoming with medical records or information about Hintz's condition, again, the correct focus is on not the actions of Uiterwyk but those of Allstate. In light of the fact that Allstate knew the amount of Hintz's medical bills throughout the seven-month period and noted the seriousness of Hintz's injury throughout its claim diary—including a July 29 note that a home office referral was warranted "[d]ue to nature and severity of claim," (Doc. 78-2 at 30)—Allstate's assertions that it did not have sufficient damages information to negotiate do not support entry of summary judgment in its favor.[14]

Allstate asserts that the "facts reflect nothing but continuous work by a group of adjusters and attorneys to investigate liability[ and] damages and confirm additional coverage for the benefit of the insureds, with a continued willingness and desire to resolve Hintz' claims." (Doc. 78 at 23). The record does reflect some work, but the Court cannot characterize it as continuous. There are time gaps during which tasks were not completed,

---

[14] Allstate's knowledge—and its own characterization of—Hintz's condition, along with the information that it had about the amount of his medical bills, distinguish this case from Aboy v. State Farm Mut. Ins. Co., 394 F. App'x 655 (11th Cir. 2010), and other cases where the insurer did not have information about the claimant's injuries. There, the Eleventh Circuit affirmed summary judgment for the insurer where the insurer "lacked any actual knowledge of the extent of [the claimant]'s injuries until [a] conversation with [the claimant]'s attorneys" shortly before the policy limits were tendered. 394 F. App'x at 657. Here, however, Allstate had been told by June 10 that Hintz had a fractured skull and a brain bleed, (Doc. 78-2 at 6), and by August 21 that his bills exceeded $485,000, (id. at 33), and there is evidence that early on Allstate regarded Hintz's injury as very serious.

(see, e.g., Doc. 78-2 at 33 (September 2, 2009 claim diary entry noting a lack of follow-up)), and in their depositions Allstate's employees sometimes were without an explanation for delays or failure to complete tasks, (see, e.g., Anderson Dep. at 94, 109, 124, 126, & 136). Allstate has not established that the work of adjusters and attorneys with regard to determining whether coverage existed under one or both of Fred and Ruth's policies—which included a five-week span where Allstate apparently neither received nor inquired as to the status of the attorney's coverage opinions—was "continuous." Although, as noted earlier, "[a]n insurer—acting with diligence and due regard for its insured—is allowed a reasonable time to investigate a claim," Johnson, 318 F. App'x at 851, issues remain for the jury as to Allstate's diligence and the reasonableness of the time it took to investigate.

Allstate also argues that it had no reasonable opportunity to settle and that there was no realistic possibility of settlement. Noting Plaintiff's reliance on Uiterwyk's June 26 letter, which invited an offer, Allstate contends that the letter was unclear and that Uiterwyk failed to explain it; that Uiterwyk "made no effort to settle" after the umbrella policy was disclosed; and that Allstate "initiated settlement negotiations within 10 days of the accident." (Doc. 78 at 26). But, as previously explained, the correct focus is not on Uiterwyk but on Allstate, and Allstate did not change its settlement behavior in the face of the umbrella policy either. And, while Allstate's tender of the limits under Stacy and Otto's policy was prompt, this case cannot be viewed in the vacuum of what occurred in the initial ten-day period or with regard to only that policy.

Allstate further asserts that Uiterwyk had no authority to settle Hintz's claim at the time of the June 26 letter because no guardianship had been established for thirty-year-old Hintz at that time. However, the fact that no guardian had been appointed by late June

2009 does not mean that Allstate had no opportunity to settle the case before January 2010.

Allstate's argument that there was no realistic possibility of settlement—that is, that Plaintiff would not have settled for any amount within the policy limits—is its strongest, but this issue is also one for the jury. The question of whether "there was no realistic possibility of settlement within the policy limits . . . is decided based upon the totality of the circumstances." Barry v. GEICO Gen. Ins. Co., 938 So. 2d 613, 618 (Fla. 4th DCA 2006). "The conduct of [the claimant] and h[is] attorney [is] relevant" to this question. Id.

Allstate contends that "[t]he facts in this case reflect an undisputable unwillingness to settle," (Doc. 78 at 28), and there is indeed abundant record evidence of unwillingness. This includes, but is not limited to, evidence of Uiterwyk's evasiveness, stalling, failure to communicate, failure to provide medical records, and failure to ever make a settlement demand even though he knew soon after the accident that Hintz had a catastrophic injury; Uiterwyk's association of bad faith counsel by August 2009 and the filing of a petition by Plaintiff on September 9, 2009, for state court approval of an enhanced attorney's fee contract with the two law firms, (see Doc. 78-43); the severity of Hintz's injuries and Plaintiff's still-pending claim against the doctors who treated Hintz at the hospital, whom he contends greatly exacerbated Hintz's injuries; and the fact that the $1.1 million limits were rejected when Allstate tendered them in January 2010. Indeed, in light of this powerful circumstantial evidence and the paucity of evidence supporting a contrary inference, a jury may well find it implausible that Plaintiff would have accepted a $1.1 million policy limits offer if it had been made earlier. Nevertheless, even under these facts, Florida

law mandates that the question of bad faith be decided by the jury, not the Court.[15]

Allstate also argues that its conduct did not cause the excess judgment against Emily and that there must be "'a causal connection between the damages claimed and the insurer's bad faith.'" (Doc. 78 at 29 (quoting Perera v. U.S. Fid. & Guar. Co., 35 So. 3d 893, 903–04 (Fla. 2010))). Perera is of no assistance to Allstate, however. There, the court noted that "[a]lthough an excess judgment is not always a prerequisite to bringing a bad-faith claim, the existence of a causal connection is a prerequisite." 35 So. 3d at 901. In Perera, no excess judgment was entered against the insured, and the plaintiff was unable to otherwise establish a causal connection between any bad faith and the damages suffered. Here, on the other hand, an excess judgment was entered against Emily after Allstate did not settle with Plaintiff.

Allstate additionally maintains that it fulfilled its duties to communicate with the Boozers and advise them of their rights; it contends that no communication failure caused the excess judgment. Allstate is not entitled to summary judgment on this basis, though, because the duty to communicate is just one aspect of a liability insurer's obligations to its insured. Even assuming that Allstate did satisfy its communication obligations, the crux of

---

[15] The Court is not unmindful of the potential for "manufactured" bad faith claims, which is noted in other cases. See, e.g., Berges v. Infinity Ins. Co., 896 So. 2d 665, 686 (Fla. 2004) (Wells, J., dissenting) ("The Court should recognize that it has the responsibility to reserve bad faith damages, which is limitless, court-created insurance, to egregious circumstances of delay and bad faith acts. The Court likewise has a responsibility to not allow contrived bad faith claims that are the product of sophisticated legal strategies and not the product of actual bad faith."); United Auto. Ins. Co. v. Estate of Levine, 87 So. 3d 782, 788 (Fla. 3d DCA 2011) ("The 'strategy' question was debated in the majority and dissenting opinions in Berges, and it is far from over.  Until there is a substantial change in the statutory scheme or the rationale explained in the majority opinion in Berges, however, juries will continue to render verdicts regarding an insurer's alleged bad faith when the pertinent facts are in dispute.") (footnote omitted).

this suit is Allstate's failure to settle, not its failure to communicate.

Finally, Allstate asserts that there is no causal connection because "Hintz has admitted other people and entities caused his [sic] excess judgment," (Doc. 78 at 30)— Plaintiff sued the medical providers who treated Hintz.  However, the fact that Plaintiff attributes Hintz's damages to doctors as well as to Emily does not change the fact that Emily has had an excess judgment entered against her.  Other than the question regarding whether Plaintiff was willing to settle within the policy limits, there is no issue of "causation" in this case.

In sum, this bad faith action is not amenable to resolution by summary judgment, and Allstate's motion must therefore be denied.

## IV.   Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that Defendants' Motion for Summary Judgment (Doc. 78) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, on April 29, 2016.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record